United States District Court for the Western Dist. of WI

JEREMY T. GREENE,
Waupun Correctional Inst., Plaintiff,
P.O. Box 351
396 S. Drummond St.; 200 S. Madison St.
Waupun, WI 53963

Case No.: 20-cv-119-wmc

vs.

KEVIN A. CARR, et al., Defendants, et al.,
Wisconsin Dept. of Corrections
3099 E. Washington Ave.
Madison, WI 53704.

# COMPLAINT

## A. PARTIES

Plaintiff: Jeremy T. Greene, pro se-prisoner, is incarcerated at the Waupun Correctional Institution, located at 396 S. Drummond St., 200 S. Madison St., P.O. Box 351, Waupun, WI 53963. Greene is U.S. citizen.

Defendants: - Kevin A. Carr, is Secretary of the Wisconsin Department of Corrections, located at 3099 E. Washington Ave., Madison, WI 53704. Carr is a U.S. citizen.

- Cindy O'Donnell, is Secretary-Designee of the Office of the Secretary of the Wisconsin Department of Corrections, located at 3099 E. Washington Ave., Madison, WI 53704. O'Donnell is a U.S. citizen.

- Brad Hompe, is Corrections Complaint Examiner of the Wisconsin Department of Corrections, located at 3099 E. Washington Ave., Madison, WI 53704. Hompe is a U.S. citizen.

- Brian Foster, is Warden of Waupun Correctional Institution, located at 200 S. Madison St., 396 S. Drummond St., Waupun, WI 53963. Foster is a U.S. citizen.

- Capt. Tritt, is Security Supervisor of the Restrictive Housing Unit at Waupun Correctional Institution, located at 200 S. Madison St., 396 S. Drummond St., Waupun, WI 53963. Tritt is a U.S. citizen.

- Ms. Kroll is the Restrictive Housing Unit Program Assistant at Waupun Correctional Institution, located at 200 S. Madison St., 396 S. Drummond St., Waupun, WI 53963. Kroll is a U.S. citizen.

- T. Moon is Institution Complaint Examiner at Waupun Correctional Institution, located at 200 S. Drummond St., 396 S. Drummond St., Waupun, WI 53963. Moon is a U.S. citizen.

- Brett Helmer is Education Director at Waupun Correctional Institutions, located at 200 S. Madison St., 396 S. Drummond St., Waupun, WI 53963. Helmer is a U.S. citizen.

(1)

( Continued from p.2 - PARTIES)

Wisconsin Department of Corrections, located at
3099 E. Washington Ave., Madison, WI 53704.
The Wisconsin Department of Corrections is
a 42 U.S.C. "public entity."

Merlin Webster, is Law Librarian at the Waupun Correctional Institution, located at 216 So. Madison St., Waupun, WI 53963. Webster is a U.S. citizen.

Catherine Trumbull, is Law Librarian at the Wisconsin Secure Program Facility, located at 1101 Morrison Dr., P.O. Box 1000, Boscobel, WI 53805-1000.

Nancy Colman, is Records Supervisor at the Wisconsin Secure Program Facility, located at 1101 Morrison Dr., P.O. Box 1000, Boscobel, WI 53805-1000.

(PARTIES- Continued on p. 2-B)

## B. Statement of Claims

¶11  Mr. Greene was incarcerated at the Wisconsin Secure Program Facility from February 2017-March of 2019. While at the Wisconsin Secure Program Facility ("WSPF") Greene utilized the Wisconsin Department of Corrections' Education Network ("EdNet") to use Microsoft Word® accounts to create and store legal materials, drafts and documents that were needed for the details/facts and law therein pertaining to a Civil Rights action regarding Conditions of Confinement and Greene's criminal Conviction (State v. Greene (case No. 01-CF-315) collateral attack. Both Greene sought to file in State court and in the Western District. The EdNet is an Inter-institutional system by which prisoners access educational programs and access Microsoft Word® for legal work purposes via mandated accounts. In March of 2019 Greene was transferred without notice from WSPF to the Waupun Correctional Institution ("WCI"), placed on Temporary Lock-up status, where Greene remained until it was decided Greene was to be kept at WCI.

¶12  On May 5, 2019 Mr. Greene wrote Warden Brian Foster an Information/Interview (DOC 761) form stating that with the implementation of revised Segregation Restrictive Housing Unit Handbook prisoners were given rubber pencils rather than the pen insert previously provided and that all the signed

(4)

authorized of the new rule back there was none lower in the chain-of-command to confide in before Foster, as the policy-maker. Greene also made Foster aware of the following:

"I currently have multiple civil cases in State / Federal Courts and am one thing a legal challenge to my criminal conviction but due to new pen ban I am unable to complete my legal work un-impeded and not without having extreme eye strain (My Rx is –4.50 + 4.00). Importantly, the pencil does not allow sufficient pressure on DOC provided (carbon copying forms) nor allow for the use of carbon paper on DOC forms of which were directed to copy, nor so I was provided [ ] provide adequate copies for court / defendant / respondents nor prior to sending Law Librarian original for copies. Also the print is too light for certain court scanners to meet demands of State and Federal Courts for printing specifications. See Wis. Statute 809, 7th Cir. Ct. brief printing specs, & Western / Eastern District (U.S. Dist. Ct. of WI). I cannot fill in commissary forms w/ dark, complete coverage. Due to pencil procurements being limited to 2x/ a week, where given sharpened pencils or it breaks were unable to write legal work. Inmates in RHU are also denied access to Microsoft Word. In order to implement their pen restrictions, could rooms be painted, staff inspect cells after each change and prisoners issued cell inspection form to document painted/ protect selves from liability (blame) for graffiti as alternative to mini pencils? et.

[side Margin: Why was my Rx 'In-part' taken when the RHU HSU Policy 500.__? say I may be still allowed to. page 1" [?]

For me, the outright pen ban is exaggerated response to too small of injures and series of impairment doubles amounts of legal action. I have glaucoma (prior to prison) & since I have serving as unconstitutional Wisdom and ADA violation. Please resolve. I have no glasses not to dissolve."

Foster refused to respond to Greene's written request.

(3)

¶investigate or act to rectify the situation

#13   On October 13, 2019 Mr. Greene wrote to the Law Librarian, Kristin Webster, via an Interview/ Information (DOC-761) form and made Webster aware that Greene was formally transferred from WSPF to WCI on ___ and was able to purchase updates (copies) of his legal documents that Christopher was watching and Greene asked Webster to "Please copy each page of the documents created within these Envelope (files) folders and send them to me". On October 14, 2019 Webster replied that "WCI do not have access to your WSPF/FIELDS FILES" word processing account. Files, we are not able to print out your requested filed documents". Mr. Greene previously worked as a library clerk while at Green Bay Correctional Institution, worked as a law-library clerk while at Columbia Correctional Institution—both prisons are maximum security levels like WSPF and WCI—and obtained needed legal documents after a previous transfer from Columbia Correctional Institution to the Fox Lake Correctional Institution, which is not aware of the ability of prison staff to access Ed-Net from any Wisconsin maximum security prison. Webster refused to investigate or act to provide Greene the needed legal documents.

#14   On October 15, 2019 Mr. Greene wrote to the WCI Education Director, Brett Helmer, via an Interview/Information (DOC-761) form and made helmer aware of the information Greene conveyed to Webster and made Helmer aware that Greene "need[s] the documents for ongoing legal matters" and would like for Helmer to process Greene's request at Helmer's earliest convenience. On October 21, 2019 Mr. Helmer responded in a letter, dated "10/21/2019," that Helmer reviewed Greene's correspondence regarding Ed-Net account and that the response Greene received from Webster was correct,

that WCI does not have the capability to access Greene's nor anyone's Ednet account since the technology at WCI "does not align with Ednet accessibility." Helmer did not[3] investigate nor act to provide Greene with the needed legal documents.

¶15 On October 21, 2019 Greene mailed the WSPF Law-Librarian, Catherine Broadbent, a letter explaining and making her aware of Greene's sudden transfer, inability to obtain needed legal documents, efforts to obtain the documents from WCI officials, their responses and provided Broadbent with the necessary forms and info to fulfill my request for legal documents. At WSPF, Broadbent, C. was the official responsible for maintaining law-library materials and fulfilling requests for legal copies. Broadbent, C. delegated the Records Supervisor, Nancy Salmon to respond. On October 30, 2019 Salmon responded that "I can not access any other folders, other than folders designated to WSPF. Upon Transfer, your account is disabled and access is denied. I cannot retrieve any documents for you from Ednet account." Greene is aware that all prisoner Ednet accounts are under management. I account and within each prisoner account are many created word documents and/or folders which are titled for organization purposes. Greene's documents pertinent to research conducted or matters occurring while at FLCI (2011-17) and WSPF (2017-19) were accordingly placed into folders that were within Greene's Microsoft Word users account and titled "FLCI" and "WSPF". Because prisoners are regularly transferred between prisons where prior/older/legal matters continue, normal practice does not include disabling the entire account and thereby losing the data. Salmon

did not [?] investigate, nor act to provide Greene with
the needed legal documents and rectify the dev-
-iation from practice.

¶16. On November 26, 2019 Mr. Greene filed offender
Complaint (RMCI-2019-20593), making Institution
Complaint Examiner, "T. Moon" aware that Greene was
working on legal work while the user on the Micro-
-soft® Word program within EdNet, was spontaneously
transferred without notice thus unable to obtain the
updated, needed legal documents stored within
Greene's "WSPF" and "FLCI" folders. Greene made
Moon aware that Greene asked WCI and WSPF
officials to obtain said legal documents at
Greene's financial expense, but have been denied
access to the documents. Greene made Moon
aware of all of the officials Greene contacted
and provided Moon the documentation exch-
-anged whilst doing so. Greene made Moon
aware that as a result of Greene continuously
being denied the legal documents the matter
was "ongoing." Greene's documentation made Moon
aware that Greene needed the legal documents
for litigation that was concerning. Despite
being duty bound to investigate, moon rejected
Greene's complaint under the guise that Greene
should have filed complaint within 14 days of
being transferred, even though Greene's initial
transfer was declared to be temporary by transport
officers. Moon refused to investigate or act to
provide Greene with the needed legal documents
vis-a-vis rendering a recommendation to the
Warden to do so via complaint "affirmance."
An Institution Complaint Examiner's recommend-
-ation is of significant if not singular
influence upon the Warden's ultimate decision
as the offender Complaint "Appropriate Review-
-ing Authority ("ARA").

¶17. On November 27, 2019 Mr. Greene filed a Request for
Review of Rejected Complaint RMCI-2019-20593,
making Warden Brian Foster, the ARA, aware that

"The ICE asserts that my complaint is un-timely since it was not filed within 14 days of the date of 'occurence,' which it deter-mines is the 28th of March, 2019, the date Greene was transferred to WCI. The ICE has chosen the date in an arbitrary manner to serve as a basis for rejecting Greene's complaint. Greene was transferred to WCI and told that the transfer was based on 3 separate reasons from multiple WCI staff, WCI and DCI (See Class-ification Summary (2019) staff, both all staff asserted initially that Greene's placement at WCI was to be temporary. It was not until April of 2019 that Security Director Mull, Ass. psych. Van Buren and another male (John Doe) decided and told Greene that Greene would be staying at WCI on a permanet basis.

Greene reiterate that WDOC EdNet is a state-wide computer system that each person may access if they so wish. Greene's legal documents (i.e., rough drafts, pleadings, motions and research) that Greene needs for pur-suit of multiple legal matters are stored in two Microsoft Word folders titled "PLCI" and "WCPP" on the EdNet. As Greene's need for these legal documents became necessary to pursue legal claims, Greene conveyed the need to multiple "WCI" and "WCPP" staff. (See sub-mitted Interview/Information Requests (i.e., 843) and and letters from Greene to staff and Interview/Info Requests and letters in reply to Greene). Upon filing Greene's Inmate Complaint, Greene conveyed that the issue is 'on-going' because Greene needs the documents, because Greene is still in need of the documents and is being denied these documents on an 'on-going' basis, Greene's complaint was timely. See State ex rel Freeman V. Pierce, 2002 WI App 213, ¶18, 257 WIS. 2d 236, 651 N.W.2d 330 (Stating that confinement in admini-strative segregation may have been construed as an 'on-going' situation by ICE, which would make an inmates complaint timely at any point for the purposes of DOC 310.09(6) regardless of the date on which the inmate was placed in segregation). Greene requested the documents at the next above."

Although Doc 310.09(6)(2002) has since been re-numb-ered to Doc 310.07(2), WIS. Adm. Code (2019), the analogous import set forth in State ex rel Freeman, Id. is applicable and Greene's Inmate Complaint was an 'on-going/timely matter and still is.

Accordingly, Greene asks the ARA to review the basis for complaint rejection in light of the aforementioned reasons set forth therein."

Despite Greene thoroughly explaining to ARA Foster that

(7)

the WCI ICF was chasing an arbitrary date of occurred rather than apply proper procedure in an effort to come at a basis to reject Greene's complaint. Foster did not investigate nor act to provide Greene with the needed legal doc- -uments. Notably, Foster is the WCI staff that initi- -ally notified Greene that Greene's transfer to WCI was temporary. On December 16, 2019 HRA Foster decided that the ICF Moon's decision to reject offender Complaint #WCI-2019-20513, was correct thus relying upon the peculiar influence of ICF Moon to reject Complaint #20592, and autho- -rizing the denial of the legal documents that Greene resolution is going to sacrifice.

¶18   Mrs. Greene has subsequently learned how to alter the pencil provided and hold them excessively hard in order to write documents. As a result of the amount of pressure required to be applied for making copies via carbon paper and so that legal documents are legible and readable the extreme Greene has developed an indentation to and finger used to hold pencil and nerve ending pain. Yet Greene persists. While placed in WCI's transition program and to serve cell confinement disposition Mr. Greene used extended access to personal typewriter, an 5x-4000 model made by Brother® International, to draft and create a State Motion for Sentence Credit, as well as, State Motion for Sentence Modification and Adjustment; however, Greene was placed into the Restrictive Housing Unit (on observation status) where Greene has remained since June 27, 2019; however, prior to being placed in R.H.U. Greene filed the aforementioned motions in State Court (State v. Greene, (Case No: 01CF-390 / Appeal No. 19AP1668-CR), the latter denied due to "insufficient" info.

¶19   On November 7, 2019 Mr. Greene made the WCI Restrictive Housing Unit (RHU) aware via an Interview/Information Request (Doc-643) that Greene currently have a Brief-in-Chief due to be filed on Nov 23, 2019 Re: State of Wisconsin v. Greene,

(9)

Case No. 01-CF-370 (Court of Appeals). Wis. Stats.,
809.19 (8)(b)(1) specifically requires that my papers
contain a clear, black, image of the original on
white paper using either a monospaced font or a
proportional serif font and prohibits carbon copies.
Because RHU prisoners access to legal materials is
limited to a area pencil and carbon paper, which
makes using a monospaced font or a proportional
serif font impossible. I must require that I be allowed
access to my Microsoft Word (BINES) account or a
typewriter and copy machine, so that I may comply
with the statutory requirements? I am enclosing
copys of the "Notification" of filing of the "clerk of Cir.
Appellant's have 40 days to file Brief-in-Chief from
the date that the Circuit Court Record is filed
(See Wis. Stat. 809.19(1)(a); which was filed 10/14/19."
The Interview/Information Request was addressed
to the RHU Supervisor, "Capt. Tritt." On November
8, 2019 RHU Program/Personal Assistant ("PA"),
Ms. Krall, responded that Krall would "discuss" the
request with "Capt. Tritt." Ms. Greene waited
until November 20, 2019, but received no response.
So Greene moved the Court of Appeals for an En-
-largement of Time to file Brief-in-Chief since Greene
was prevented from timely creating and filing a
brief that complied with State statutory req-
-uirements. Greene also moved the Court to prov-
-ide some sort of equitable relief via compelling
the Wisconsin DOC/Waupun Correctional Institution
"to provide the Appellant with adequate access to
the same Microsoft Word Computer program as
general population prisoners are afforded
throughout the WDOC, access to a State-owned
typewriter and adequate photocopies (via the prison
general population photocopy machine or adequate
access to the defendant's personal Brother SX-4000
typewriter and to adequate photocopy ability, so that
the Appellant may comply with the court's brief
filing requirements, as set forth in Wis. Stats., § 809.19
(8)(b)(1)...? See Attached Motion, p. 1., dated 11/20/19, to
WI. Ct. App. Greene alternatively asked the Court

to appoint counsel, contact the WDOC will provide
an enlargement of time allowing Greene to file a
hand-written brief in grey pencil. See Attached Motion,
P. 7, dated November 20, 2019. On November 26, 2019
WI. Court of Appeals Judge, Graham, J. dec-
-ided Greene's motion.

"Jeremy Greene, pro se, moved for an extension
of the time to file the Appellant's brief due
to limited access to typing, printing, and
photocopying resources as a result of his
imprisonment. Good cause is shown for the
requested relief.

Greene also requested that this court issue
an order compelling prison officials to provide
him with access to his personal typewriter and
other materials. I will deny this request be-
-cause this court does not have the authority
to direct the Department of Corrections to
handle its affairs in any particular manner.
State ex rel. Spoon v. Electoral Bd., 133 Wis 2d 187,
97, 398 Wis 2d 782, 786 (1986) (holding that the
Court of Appeals does not have jurisdiction to
entertain an original action unrelated to its
supervisory or appellate authority over the
Circuit Court).

IT IS ORDERED that the time to file
the Appellant's brief is hereby extended to
January 28, 2020.

IT IS ORDERED that the motion to
compel materials is denied."

See Attached Decision and Order, dated Within Infra.

¶10 On November 26, 2019, RHU Lt. Krall also provided
Mr. Greene with the response to request for access
to Microsoft Word or typewriter by stating that:
"Typewriters are not allowed in RHU" On November 26,
2019 Greene wrote Capt. Tritt Sec-in-Na on
Interview Information Request (DOC-643) and
made Tritt aware of the limitations of RHU preventing Greene
from meeting the statutory requirements for filing a brief,
of previous effort to contact Tritt of Krall's reply on Tritt's
behalf and that Krall replied that typewriters would
not be allowed in RHU, but made no mention of
Microsoft Word. Greene implored Tritt to render a decision
about the use of Microsoft Word since Tritt is the super-

-visor of the RHU building, Tritt delegated duty to make a decision to PA Kroll who informed Greene "[t]ypewriters and your discs are not allowed in RHU" and that Greene was "allowed "LexisNexis" and legal materials located in the legal rec rooms." Kroll's decision was rendered November 29, 2019. Tritt nor Kroll[18] in retrospect nor acted to provide Greene with the access to the tools needed to create and file legal documents, pursuant to State[20] statutory filing req-uirements. See Attached Copy of Wis. Stats., s.809.19(b) (W)(1)(2019). WCI RHU currently has an "Electronic Institution Law-Library station in each wing of the Unit, totaling three stations total. The RHU also has a small conference booth that has a mouse affixed to a counter, which is connected to a computer in an adjacent windowed room. All of the aforementioned computers have Microsoft Word program on them and the Internet could easily be accessed for use with a disk, thumb-drive or managed account, while having a keyboard affixed to counter like the mouse and like the ETLLS has.

¶[21] On December 5, 2019 Mrs. Greene made WCI ICE Moon, T., aware, via Offender Complaint #WCI-2019-21533, that Greene contacted ▒ with PA Kroll and Capt. Tritt and requested to utilize[22] typewriter or Microsoft Word in order to comply with State filing requirements "for appellant brief and that the provided/allowed materials were inadequate. Being duty bound to investigate,[23] Moon, also made aware that Greene was "still unable to file a brief as the Wis. Stats. require," refused to investigate or act to provide Greene with the needed legal ▒▒▒▒ tools, vis-a-vis rendering a Recommendation to the Warden to do so via Complaint affirmance. Rather, On December 13, 2019 T. Moon recommended Greene's complaint #WCI-2019-21533 be dismissed based on the following:

"The flexible pencils comply with the provisions in DAI Policy 303.00.02 and Doc 303. There is no

(11)

obligation to provide pen inserts. The Complainant does not describe an instance, whereas a document submission was rejected because it could not be read. The complainant is also advised Capt. Tritt has instituted a process by which inmate with court deadlines may obtain a black crayon at legal recreation. Any further concerns may be relayed to Capt. Tritt."

In offender Complaint #WCI-2019-21553 Greene made WCI-ICE T. Moon ▓▓▓▓ aware that neither Capt. Tritt nor RHU PA Knoll responded to Greene's request in time for Greene to file a brief by the filing deadline, which met State statutory filing requirements and yet Moon recommended that Greene Complaint be dismissed.

¶12    Following the receipt of WCI-ICE T. Moon's recommendation to dismiss Greene's offender Complaint #WCI-2019-21533, Brian Foster, the [25]RA, had the authority to [26]return the Complaint to the ICE for further investigation" but was ultimately duty-bound to[27] affirm or dismiss the complaint in whole or in part." Foster did not [3]investigate nor act to ensure that Greene was provided the tools necessary to meet the State statutory filing requirements for an appellant brief despite being made aware that Greene was was unable to do so via Offender Complaint #WCI-2019-21533. Relying soley upon the [28]singular influence of WCI-ICE T. Moon's recommendation, Foster dismissed offender Complaint #WCI-2019-21533, thereby authorizing the denial of Greene's access to the tools needed for collaterally attaching criminal conviction, pursuant to State statutory brief filing requirements.

¶13    On December 20, 2019 Greene [29]appealed the denial of Offender Complaint #WCI-2019-21533 by filing a DOC-405-Inmate Complaint Appeal. Greene appealed on the grounds that Greene was not satisfied with the decision of Foster because the RA dismissed Greene's Complaint without removing the[30]hinderance to allowing Greene or any RHU prisoners the ability to

file a brief in the WI Court of Appeals that complies with the statutorily required brief specifications of Wis. Stats., § 809.19(8)(b)(1) and 809.19(8)(b)(4), which collectively require an appellate brief to contain a clean, black, image of the original on white paper, using a "1½ monospaced" font or "proportional serif" font, no carbon copies and securely bound with heavy strength staples or by means of velo-binding or the "perfect" (hot glue) binding method. Mr. Greene also appealed on grounds that after being denied access to typewriter and Microsoft Word, Greene missed November 23, 2019 "brief filing deadline" and had to obtain a new brief filing deadline" of January 23, 2020. Mr. Greene's appeal of offender complaint made the Corrections Complaint Examiner"("CCE") and the Secretary" aware of Greene being impeded from filing a brief that complies with State statutory requirements as a result of being denied the adequate tools to do so?"

¶14   Corrections Complaint Examiner Brad Hompe had full access to the institution, inmates, employees, and department records to investigate the appeal," while being duty bound to send a recommendation to the Secretary that the reviewing authority decision be affirmed or dismissed, in whole or in part. CCE Hompe refused to investigate nor act to provide Greene with the needed legal tools, vis-à-vis, rendering a recommendation to the Secretary to do so. Via dismissal of the reviewing authority decision of Foster to dismiss offender complaint WCI-2019-21532, rather, On January 8, 2020 CCE Hompe recommended Greene's Inmate Complaint Appeal be dismissed by the Secretary based on the following:

"Agree with RCE. This inmate may contact the Captain for a writing instrument accepted by the court. Dismissal is recommended."

¶15  Following receipt of CCE Hompe's recommendation, the Secretary-designee, Cindy O'Donnell, had the authority to "return the appeal to the CCE for further

(14)

investigation," while being duty-bound to either [7] affirm or dismiss the CCE's recommendation, in whole or in part." The Secretary's decision is final. Wis. Adm. Code, CH. Doc. §§10.12 (3)(2020). The Secretary also has the ultimate policy-making authority over the WIDOC. The Secretary refused to investigate, enforce proper policy exists, nor act to provide Greene with the tools necessary prepare and file meaningful legal papers, by dismissing the CCE recommendation and affirming Greene's Inmate Complaint Appeal of the dismissal of Offender Complaint WCI-2019-21522, which would allow Greene to timely file a brief that adheres to state statutory requirements. Relying soley upon the singular influence of CCE Hautpe, Secretary-designee Cindy O'Donnell, adopted the recommendation and dismissed Greene's appeal on January 23, 2020, thus authorizing the denial of Greene's access to the tools needed for collaterally attacking criminal conviction, as required by state statute brief filing requirements.

## C. JURISDICTION

I am suing for a violation of Federal law under 28 U.S.C. §1331, 42 U.S.C. §1983 and ask the Court to assume supplemental jurisdiction, pursuant to applicable laws. See 28 U.S.C. §1367.

## D. RELIEF WANTED

1) I am seeking a preliminary injunction, which would provide access to the Microsoft Word documents already saved on the EAHCL, so that I may obtain copies of the needed legal research, notes, drafts and documents and access to Microsoft Word program for use to prepare and create a brief that conforms to the statutory/court rule requirements. See Plaintiffs Motion for Temporary Restraining Order and Plaintiff's Declaration in Support of Plaintiff's Motion for Temporary Restraining Order.

2) I am seeking punitive damages in the amount of $15,000.00, to serve as a deterrent.

3) I am seeking a permanent injunction that requires WDI and the WDOC to provide a prisoner, like Grane (myself), with the access to a pen, insert and Microsoft Word program or typewriter and necessary supplies while in RHU if state statute or court rule for brief specification(s) (or for other papers) make the use of such tools necessary to prepare and submit brief (or other papers) meet those specifications.

4) I am seeking a permanent injunction that requires the WCI and the WDOC to provide a prisoner, like myself, with the ability to secure legal papers for filing in accordance with state statutes or court rule while in RHU.

5) I am seeking a permanent injunction that requires the WCI and the WDOC to provide a prisoner, like myself, with glasses with the use of a pen/insert while in RHU for document drafting.

E. JURY DEMAND

If this case proceeds past dispositive motions and the defendants and I are/or able to reach a suitable agreement, I am seeking a jury trial.

F. Authorities in Support and Footnotes

- Wisconsin Constitution, Art. I, Sec. 4

"The right of the people to assemble, to consult for the common good; and to petition the government, or any departments thereof, shall never be abridged."

- Wisconsin Constitution, Art. I, Sec. 9

"Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws."

See Aicher v. Wisconsin Patients Compensation Fund, 2000 WI 98; 237 Wis. 2d 99; 613 N.W.2d 849 (This section

(15)

applies only when a litigant seeks a remedy for an existing right. It "preserves the right to obtain justice on the basis of laws as it in fact exist. Legislative actions define how the laws work in reality); *Thomas v. Mallett*, 2005 WI 129 [235 Wis.2d 236; 701 N.W.2d 523] (Although Article I, §9 may not create new rights, it does allow for a remedy through existing Constitutional law. The goal of providing certainty is not necessarily achievable...The common law develops to adapt to the changing needs of society); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166 [342 N.W.2d 37] (In [4]) (When an adequate remedy does not exist to resolve disputes or provide due process, the courts can fashion an adequate remedy).

— United States Constitution, Amend. 1 (1791)

"Congress shall make no law ... abridging the ... right of the people ... to petition the Government for a redress of grievances."

See *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 [741-742; 103 S.Ct. 2161] (1983) ("The right of access to the courts is an aspect of the first Amendment right to petition the government for redress of grievances"); *Bounds v. Smith*, 430 U.S. 817, 825, 828 [97 S.Ct. 1491] (1977) (Holding that a prisoner's right to "meaningful access to the courts" encompasses the ability to "prepare" and file "meaningful legal papers"); *Pratt v. Tarr*, 502 F.3d 647, 657 (7th Cir. 2007) (Holding right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers"); *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009) ("The right of access to the courts requires prison officials to provide prisoners with the necessary tools to attack their sentences, directly or collaterally, and to challenge their conditions of confinement"); *Gentry v. Duckworth*, 65 F.3d 555, 558 (7th Cir. 1995) (Explaining that "notary services where required by procedural rules" are part of "necessary scribe materials includ[ing] paper, some means of writing, [and] adhesives" but clarifying that "the right to Court access does not require specific tools but

whatever tools (which would render access adequate), citing Gluth v. Kangas, 951 F.2d 1504, 1510 (9th Cir. 1991)(Holding district Court does not abuse discretion in determining that providing file folders may be necessary for effective legal research or that providing brief covers and binding, and typing supplies (as opposed to mere pen and paper) for hand-written briefs)is a reasonable way to ensure that inmates can communicate with the Courts." The Court held that "Simply because the constitution does not require such items to be provided does not mean that it is inappropriate to order them in the course of fashioning a remedy."), citing Toussaint v. McCarthy, 801 F.2d 1080, 1081 (9th Cir. 1986); See also Johnson v. Parke, 642 F.2d 377, 380 (10th Cir. 1981).

"When numerous copies of often lengthy Complaints or briefs are required, it is needlessly draconian to force an inmate to hand copy such materials when a photocopy machine is available and the inmate is able and willing to compensate the state for it's use. Allowing inmates to pay for and receive photocopies of the legal materials required by the courts is part of the meaningful access to the Court's that inmates are constitutionally entitled to."

In Nance v. Vieregge, the Court held that "[T]o establish a deprivation of access to the court, a prisoner must show that unjustified acts or conditions 'hindered his efforts to pursue a legal claim.' Lewis v. Casey, 518 U.S. 343, 351 (1996)..... If the hindrance is ongoing, prospective relief can compel the state to restore access so that the claim may be vindicated. This was the theory behind the order in Bounds v. Smith... to improve the prisons law-library... what makes an access to the courts claim distinctive is the remedy — equitable relief to restore access." Nance, 147 F.3d 589, 591 (7th Cir. 1998); See Marshall v. Nickel, 445 F.3d 965, 969 (7th Cir. 2006)(Holding Court "do[es] not agree that Lewis confines access-to-Court claims to situations where a prisoner has been unable to file a complaint or an appeal."); See also Bruscino v. Carlson, 854 F.2d 162, 167 (7th

Cir. 1988)(citing examples of prejudice in Court Access denial cases, as: missing a statute of limitations dead-line, failing to make a timely filing, being denied legal assistance or losing a case that could have been won); Hossman v. Hilquist, 833 F.2d 634, 642, 643 (7th Cir. 1987)(same); Lehn v. Holmes, 364 F.3d 862, 866 (7th Cir. 2004)(Holding prisoners have no free standing right to specific "tools", but have the ability to prepare and file meaning ful legal papers that are non frivolous without being "frustrated" or "impeded" by State actions).

- <u>United States Constitution</u>, Amend. 5 (1791)

¶9 "No person shall be ... deprived of life, liberty, or property, without due process of law."

- <u>United States Constitution</u>, Amend. 14 (1868)

"No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of ▓▓▓▓▓▓▓▓ the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The right articulated in <u>Bounds v. Smith</u>, 430 U.S. 817, 97 S.Ct. 1491 (1977) has been described as a "consequence" of due process, <u>Murray v. Giarratano</u>, 492 U.S. 1, 11 n.6, 106 109 S.Ct. 2765 (1989), citing <u>Procunier v. Martinez</u>, 416 U.S. 396, 419, 94 S.Ct. 1800 (1974), as an "aspect" of equal protection, <u>Murray</u>, 492 U.S. at 11 n.6, or as an "equal protection guarantee", <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557, 107 S.Ct. 1990 (1987).

- <u>Wisconsin Constitution, Art. I, Sec. 1</u>

"All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

See <u>County of Kenosha v. C & S Management, Inc.</u>, 233 Wis. 2d 373, 393-394, 588 N.W. 2d 236, 246-247 (1999)(Holding the state and federal Constitution provide identical equal protection safeguard); <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985)(Holding federal Government must obey some equal protection standard as the States); <u>Village of Willowbrook</u>

V. Grace Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074-1075 (2000) ("our cases have recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that she has been treated differently than others similarly situated and that there is no rat-ional basis for the difference in treatment. See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 67 L. Ed. 340, 43 S. Ct. 190 (1923); Allegheny Pittsburgh Coal Co. v. ▓▓▓▓▓▓▓▓▓▓▓▓▓ Commission of Webster Cty., 488 U.S. 336, 102 L. Ed.2d 688, 109 S. Ct. 633 (1989). In doing so, we have explained that "the purpose of the equal prote-ction clause of the fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly consti-tuted agents." Sioux City Bridge Co., supra, at 445 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 62 L. Ed 1154, 38 S. Ct. 495. (1918)); see Enquist v. Oregon Dept of Agriculture, 553 U.S. 591, 597, 602, 128 S. Ct. 2146, 2150, 2153 (2008) ("It is well -settled that the Equal Protection Clause 'protects persons, not groups.' Adarand Constructors v. Pena, 515 U.S. 200, 227, 115 S. Ct. 2097 (1995) (cite omitted), and that the clause's protections apply to administrative as well as legislative acts, See, e.g. Raymond v. Chicago Union Traction Co., 207 U.S. 20, 35-36, 28 S. Ct. 7 (1907) (cite omitted)... [T]he [C]ourt we explained long ago, the fourteenth Amendment 'requires that all persons subjected to...legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and the liab-ilities imposed.' Hayes v. Missouri, 120 U.S. 68, 71,7 S. Ct. 350 (1887) (cite omitted). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational basis for the difference, to ensure that all persons subject to legislation or regulation are indeed treated alike, under like circumstances and conditions. Thus, when it appears, that an individual is being singled out by the government, the specter of arbitrary classification is raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." Olech, 528 U.S., at 564, 120 S. Ct. 1073 (cite omitted).).

In Enquist, the U.S. Supreme Court held that the Court's "traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations

(19)

applicable when the government acts as employer as opposed to sovereign, lead us to conclude that the class-of-one theory of equal protection does not apply in the public employment context." Engquist, Id. at 598. Black's Law Dictionary defines "sovereign" as "[a] person, body, or state vested with independent and supreme authority." Black's, p. 1195 (Abridged 9th Ed.) (ISBN # 978-0-314-26579-4). The Engquist Court explained that the Courts public-employee speech cases are particularly "instructive," Engquist, at 599, and cited to the fact that public employee speech rights are limited to matters of "public concern," Engquist, Id. at 598, citing to Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983), since government officials "should enjoy wide latitude in managing their offices," Engquist, Id. 598, quoting Connick at 146. As of 2014, the Wisconsin (federal) U.S. District Courts were split as to whether a prisoner could bring a "class-of-one" claim. Cf. Watts v. Miller, 2014 U.S. Dist. LEXIS 3127.8, *17-18-11 (Holding Engquist bars a prisoner from bringing a "class-of-one" claim) (Judge Rudolph T. Randa) (citing to Franklin v. Gray, No. 12-CV-426-bbc, 2013 U.S. Dist. LEXIS 19724, 2013 WL 541529 at *2-3 (W.D. Wis. Feb. 13, 2013) and Jackson v. Kieger, No. 12-CV-220-bbc, 2012 U.S. Dist. LEXIS 167055, 2012 WL 5247275 at *4 (W.D. Wis. Oct. 23, 2012)) with Glover v. Dickey, 2014 U.S. Dist. LEXIS 52576, *11, Case No. 14-CV-87, (Judge Lynn Adelman) (E.D. Wis.) (Holding prisoner stated a claim and could proceed under a "class of one" theory).

In Connick, the court held that "[b]ecause [a] district attorney's speech was not intended to inform the public that his office was not fulfilling its responsibilities or to disclose potential wrongdoing, her speech was a matter of her own personal interest and did not constitute protected speech." Bivens v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009), citing to Connick, at 148. In Watkins v. Kasper, the Court held that "upon further consideration, we think that it's time to completely jettison the public concern test from our prisoner free speech jurisprudence, even in the case of speech by a prisoner-employee. In our view, the dynamics of the government's relationships with prisoner-employees and with public employees are too dissimilar to transfer the public concern test to the prison context." Watkins, 599 F.3d 791, 795 (7th Cir. 2010). The court explained that "the prisoner's job is only

a small aspect of a larger penological program..... [A]ny marginal discretion that the public concern test might give prison officials in controlling prisoner employees is eclipsed by the substantial deference that they have in controlling the entire prison population." *Watkins*, at 195. See *Caldwell v. Miller*, 790 F.2d 589, 598 (7th Cir. 1986)(Holding that the court does not find it "appropriate for [the court] to defer completely to prison administrators."), citing to *Madyun v. Franzen*, 704 F.2d 954, 960 (7th Cir. 1983); See also *Leek v. Jenkins*, 641 F.2d 488, 498 (7th Cir. 1981)("We do not read [and citing to [Bell v.] Wolfish] to require this court to grant automatic deference to what incantations of prison officials that their actions further the goals of order and discipline."); *Wolff v. McDonnell*, 418 U.S. 539, 583 (1974)("[T]here's significant potential for abuse of the disciplinary process [ by `persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy... [such as] `prison guards seeking to vindicate their otherwise absolute power over the men [and women] under their control."); *Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985)(Recognizing that prison officials "are under obvious pressure to resolve disciplinary disputes] in favor of the institution and their fellow employee.... It is the old situational problem between the keeper and the kept. a relationship that is likely conducive to err true adjudicative performance."); *John Farton et al. Aid Society, The Prison Litigation Reform Act (2008), http://www.law.yale.edu/documents/pdf/Factor, PLRA Treatise.pdf (noting "a documented pattern in American prisons of threats and retaliation against prisoners who file grievances and complaints."); Prison Abuse Remedies Act of 2007: Hearing on H.R. 4109, Before the Subcomm. on Crime, Terrorism + Homeland Security of the H. Committee on the Judiciary, 110th Cong. 72 (2008), Statement of Ernest D. Peatce, Jr. ("If you think that retaliation is not a part of everyday prison life, then you don't know the realities of prison."); James R. Robertson, "One of the Dirty Secrets of American Corrections: Retaliation, Surplus Power, and Whistleblowing Inmate", 42 U. Mich. J.L. Reform, 611, 613-614, note 11; No. 3 (2009) Justice: The Prison Litigation Reform Act in the United States, Hum. Rts. Watch 20, 28, 42 (2009), http://www.hrw.org/sites/default /files/reports/us0609web.pdf (documenting inmate fears of retaliation, including through Congressional testimony in support of the Prison Rape Elimination Act), John J. Gibbons & Nicholas de Katzenbach, Vera Inst. of Justice, Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons, 42-91 (2006), http://www.vera.org/download ?file=2845/confronting confinement.pdf (documenting the ineffectiveness of prison grievance systems and noting "Corrections officers also fear retaliation by fellow officers if they report wrongdoing").

Accordingly, "when courts defer to administrative discretion, it is this guard to whom they delegate the final word on reasonable prison practices. This is the central evil in prison.... the unreviewed administrative disc-retion granted to poorly trained personnel who deal directly with prisoners." Wolff v. McDonnell, id. at 571, quoting Hirschkop & Millenman, The Unconstitutionality of Prison Life, 55 Va. L. Rev. 795, 811-812 (1969). "Time has proven that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon institutional order; the orderly care with which decisions are made by the prison authority intimately relates to the level of respect with which prisoners regard their authority. There is nothing more corrosive to the fabric of a public institution than a feeling among those whom it contains that they are being treated un-fairly." Wolff, Id. at 583. Where deference applies, see Turner v. Safely, 482 U.S. 78, 89 (1987), "[D]eference does not imply aban-donment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029 (2003). Also, deference "does not insulate from review actions taken in bad faith and for no legitimate purpose." Lewis v. Lane, 816 F.2d 1165, 1171 (7th Cir. 1987), quoting Whitley v. Albers, 475 U.S. 312, 106 S. Ct. 1078 (1986). Thus, in Boumediene v. Bush, the U.S. Supreme also recognized that prior judicial holdings on judicial over-sight "affirm the duty and authority of the judiciary to call the jailer to account." Boumediene 553 U.S. 723, 745 (2008); Davis v. Ayala, 135 S. Ct. 2187 (2015) ("[T]he judiciary may be required, within its proper jurisdiction and authority, to determine whether workable alternative systems for long-term confinement exist, and if so, whether a correctional system should be required to adopt them.") (Kennedy, J. Concurring); Burns v. Martuscello, 890 F.3d 77, 90 (2d Cir. 2018) ("The governance of our criminal justice system, and the methods that may be undertaken in the maintenance of that system, are plainly matters of broad public concern. See Johnson v. California, 543 U.S. 499, 511, 125 S. Ct. 1141, 160 L. Ed 2d 949 (2005) (observing that 'society as a whole suffers' when prison officials' actions run afoul of gen-erally applicable constitutional principles)"); Sqiegla v. Hull, 371 F.3d 928, 936 (7th Cir. 2009) ("Without doubt, issues of prison security, public safety, and official corruption are matters of concern to the community, particularly to one hosting a correctional facility."). "[I]n the context of a prison, the public includes other prisoners, so that a statement may be a matter of public concern even if non-prisoners might not be inter-ested in the matter." Wilson v. Greeton, 571 F.Supp. 2d 948 (2007).

In Hasan v. Dep't of Labor [DoL], the Court recognized "[A] prisoner is 'to (the loss of) free ████████ than a free person, but less it not zero and if he is a victim of retaliation for the exercise of what free speech he does have, he should have the same right to a remedy as his free counterpart. Cf. Turner v. Safely [482 U.S. 1, 78] at 84, 96 L.Ed.2d 64, 107 S. Ct. 2254 (1987)." Id. 400 F.3d 1001, 1005-1006 (7th Cir. 2005). It stands to reason, that although a prisoner's rights may be limited under the equal protection clause as a 'class-of-one' due to the larger penological program and "substantial deference" that prison officials have in controlling the entire prison population, Watkins, at 795, a prisoner subjected to methods and actions of prison officials that ████████ treat a prisoner differently although under similar conditions and circumstances, and without a "rational" basis for the difference in treatment, he too should have the same right to a remedy as his free counterpart. See Levenstein v. Salafsky, 164 F.3d 345, 352 (7th Cir. 1998)(recognizing equal protection clause violated and action-able when "the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity towards him"), quoting Esmail v. McCrane, 53 F.3d 176, 179 (7th Cir. 1995); See also Dewalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000)("[I]f prison officials were to allocate T.V. time, visitation privileges, prison jobs, or any of the other privileges prisoners enjoy, on an otherwise illegal or discriminatory basis, their actions would be unconstitutional even though such privileges do not constitute liberty or property interests."); Watkins, Id. at 796 ("Prison officials have broad discretion to regulate prisoners' speech when 'consistent with legitimate penological interests.' Turner, 482 U.S. at 89. Given their broad backgr-ound authority under Turner prison officials don't need the benefit of the public concern requirement, and attempting to graft this requirement onto prisoner-empl-oyees' free speech claims would needlessly complicate the legitimate penological interests test."). Cf. Pearson v. Welborn, 471 F.3d 732, 741 (7th Cir. 2006)("Nothing in the First Amendment itself suggests that the right to petition for re-dress of grievances only attaches when the petitioning takes a specific form.... Government officials performing discretionary functions are entitled to qualified immunity when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982) ... See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034

(23)

97 L. Ed 2d 523 (1987) (relevant inquiry is not whether some action in question has previously been held unlawful, but whether unlawfulness would be apparent in light of pre-existing law)); cf. Wis. Stat., §227.10(3)(c) ("Each person affected by a rule is entitled to the same benefits and is subject to the same obligations as any other person under the same or similar circumstances."); Anderson v. Romero, 72 F.3d 518, 526 (7th Cir. 1995) ("Equal Protection Clause forbids state to treat one "class—including group of prison inmates—arbitrarily worse than another."); Leslie v. Doyle, 125 F.3d 1132, 1136-1137 (7th Cir. 1997) ("Prison officials can effect cruel and unusual punishment when they "deliberately abuse their power, without regard to legitimate punitive purposes, in a calculated effort to torture inmates."); May v. V. Sheahan, 226 F.3d 876 (7th Cir. ) ("In the prison context, the equal protection clause of the Fourteenth Amendment re-quires inmates to be treated equally unless unequal treat-ment bears a rational relation to a legitimate penal interest. Hudson v. Palmer, 468 U.S. 517, 523, 104 S. Ct. 3194 (1984)(citing Lee v. Washington, 390 U.S. 333, 88 S. Ct. 994 (1968)(per curiam)); Williams v. Lane, 851 F.2d 867, 881-882 (7th Cir. 1988)(Holding that not any difference in the nature of a detainee's confinement justifies different treatment, differences in treatment among inmates in different confinement situations—Segregation vs. general Population—will support an equal protection claim and affirming a decision finding an equal protection violation in the differ-ent treatment afforded two groups of prisoners."); French v. Heyne, 547 F.2d 994, 998-999 (7th Cir. 1976)(Holding that restriction of vocational programs to prisoners with short indeterminate sentences stated an equal protection claim in the absence of a rational justification in the record.).

    In King v. McCarty, the court determined "Courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration. Although "Prisoners are deprived of many "rights" during their incarceration," they "retain the essence of human dignity inherent in all person-hip." 781 F.3d 889, 897 (7th Cir. 2015) quoting Brown v. Plata, 134 S. Ct. 1910, 1928 (2011)); Wolff v. McDonnell, 418 U.S. 539, 555-556 (1974)("There is no iron curtain drawn between the Constitution and the prisons of this country ... the proposi-tion that prisoners in state institutions are wholly without the protections of the Constitution and the Due Process Clause ... is plainly untenable."); Trop v. Dulles, 356 U.S. 86, 103-104 (1958)("Recognizing the Court is "oath bound to defend the Constitution... The Judiciary has the duty of implementing the safeguards that protect individual rights... The provisions of the Constitution are not time worn adages

or shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government. When the constitutionality of an Act of Congress is challenged in this Court, we must apply these rules. If we do not, the words of the Constitution become little more than "good advice." When it appears that an Act of Congress conflicts with one of these provisions, we have no choice but to enforce the paramount commands of the Constitution. We are sworn to do no less. We cannot push back the limits of the Constitution merely to accommodate challenged legislation. We must apply those limits as the Constitution prescribes them, bearing in mind both the broad scope of legislative discretion and the ultimate responsibility of constitutional adjudication. We do well to approach this task cautiously, as all our predecessors have counseled. But the ordeal of judgment cannot be shirked."). It stands to reason that the ordeal of judgment of prisoner "class of one" claims likewise cannot be shirked. Jordan v. Cockroft, 08-CV-1093 (E.D. Wis) (J. P. Stadtmueller, U.S. District Judge), 2012 U.S. Dist. LEXIS 30230, *23-2.8 (Allowing prisoner "class of one" claim to proceed to Summary Judgment). "This quotes Marshall in Marbury because 'that it be true that where there is a legal right, there is also a legal remedy... and that every right when withheld, must have a remedy,' then it is true even when the right at issue implies 'the very ability of litigants to seek judicial review of governmental action. This form of governmental accountability to the law and to the people is itself an aspect of the judicial duty "to say what the law is!"' Douglas E. Edlin, A Constitutional Right to Judicial Review: Access to Courts and Ouster Clauses in England and the United States," 57 AM. J. Comp. L. 67, *92, nn. 79-80, quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 177 (1803). "because a prisoner is divested of the privilege to vote, the right to file a court action might be said to be his remaining 'most fundamental political right, because preservative of all rights,'" McCarthy v. Madigan, 503 U.S. 140, 153, 112 S.Ct. 1081 (1992), quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). "The class of litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means ▯ other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." Davis v. Passman, 442 U.S. 228, 242 (1979).

# FOOTNOTES

1. "For example, Microsoft Windows 3.1 easily can be configured to permit a user to execute only a certain set of programs. The procedure involves building a 'restrictions' section into the program .ini initiation file read by the Windows' Program Manager on startup. Restrictions that can be placed on users include disabling of the 'Run' and 'Exit' Windows' commands under the File menu; preventing the user from altering and/or saving changes to the Program Manager's program groups or icon (other); and disabling the File menu completely. See Microsoft Corporation, Microsoft Windows Resource Kit: Complete Technical Information for the Support Professional for the Microsoft Windows operating system Version 3.1, 221, 276 (1992); Fred Davis, The Windows 3.1 Bible 172 (1993)." Bryant v. Mula, 72 N.C.L. Rev. 1692, n. 226, Inmate Access to Prison Computers for Legal Work and the Access to the Court.

2. Wis. Adm. Code, DOC 303.02 (40)("'TLU' means a temporary non-punitive status allowing an inmate to be separated from the general population pending further administrative action").

3. Reed v. McBride, 178 F.3d 849, 854 (7th Cir. 1999)("A prison official's knowledge of prison conditions learned from an inmate's communication can require the officer to exercise his authority and to take the needed action to investigate and if necessary, to rectify the offending condition"); citing Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996).

4. State ex rel. Freeman v. Board, 2002 WI APP 213, 318, 257 Wis. 2d 736, 651 N.W. 2d 881, 886 (Recognizing placement into a status or condition that that is "ongoing" may trigger an "occurrence" so long as "said status/condition remains thus making complaint timely as long as status/condition remains").

5. Heard v. Sheahan, 253 F.3d 316, 319 (7th Cir. 2001)("The doctrine of continuing violation tells the limitations period explains that where the doctrine is applicable 'the cause of action accrues at... the date of the last injury'"), quoting Watson v. Burlington Northern Santa Fe R.R., 240 F.3d 1232, 1237 (10th Circuit 2001).

6. Wis. Adm. Code, DOC 310.04 (2)("Each institution shall appoint an Institution Complaint Examiner whose responsibility shall be complaint investigation...")(2018)(Chapter Doc 310 as of is listed on February 28, 2018 was repealed and a new chapter DOC 310 was created; Register March 26, 2018 No. 147, eff. 4-1-18; "April 1, 2018." Chapter DOC 310 Complaint Procedures Note; Wis. Adm. Code, DOC 310.03 (12)("Institution complaint examiner" or "ICE" means the person or persons at each institution designated by the warden to process, investigate, and make recommendations under this chapter")(2020); DOC 310.10 (7)("The ICE shall have full access to the institution, inmates, employees and department records to investigate the complaint.").

7. Wis. Adm. Code, DOC 310.10 (7)("The ICE may recommend to the reviewing authority that the complaint be affirmed or dismissed in whole or in part.")(2020); Hennings v.

, 06-C-353-C (W.D. Wis.), 2007 U.S. Dist. LEXIS 41746, pp. 14-16 ("[T]he language of 42 USC §1983 (the statute that authorizes civil lawsuits for constitutional violations) does not limit individual liability to final decision-makers. Rather, it imposes liability on anyone acting under color of law who 'subjects or causes to be subjected' a person to a constitutional violation. The Court of Appeals has interpreted this language as requiring that a defendant be 'personally involved' in constitutional deprivation at issue. Morfin v. City of East Chicago, 856 F.2d 985, 993-994 (7th Cir. 1988)(Police officers who gave knowingly false reports to prosecutor could be held liable for charging decision that relied on these reports). A subordinate who uses a higher ranking official to follow a particular course of conduct cannot later protest that he had no involvement in the decision that followed or that he could not have foreseen it. Johnson v. Johnson, 385 F.3d 503, 527 (5th Cir. 2004) (rejecting view that defendants could not be held liable because they only made recommendations to a higher authority)").

8. Wis. Adm. Code, DOC 310.14 (2)("The reviewing authority shall affirm or dismiss the complaint in whole or in part or return the complaint to the ICE for further investigation?)

9. The ICE's recommendation exerts such significant influence over ultimate complaint decisions that the ICE's intent is imputed to the warden/Reviewing Authority. See Bodish v. Oakbrook Terrace Fire Protection District, 604 F.2d 490, 508 (7th Cir. 2010)("Whether the influence must be a singular influence is unclear in this circuit. See Long v. Teachers' Ret. Sys. of Ill., 585 F.3d 344 at 351 (7th Cir. 2009)("Some cases hold that a subordinate must have a 'singular influence' over the decisions and others do not draw such a bright line" (internal citations omitted)). A singular influence is one in which the employee possesses so much influence and power over the nominal decision-maker that the employee for all intents and purposes is in fact, the true functional decision-maker. Brewer v. Bd. of Trs., 479 F.3d 908, 917 (7th Cir. 2007), citing Lille v. Ill. Dept. of Revenue, 369 F.3d 1007, 1015 (7th Cir. 2004); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990); Staub v. Proctor Hosp., 560 F.3d 647, 659 (7th Cir. 2009) ("To be a 'cat's paw' requires more; true to the fable, it requires a blind reliance, the stuff of 'singular influence.") Cert granted, No. 09-400, 130 S. Ct. 2089, 176 L.Ed.2d 720, 2010 U.S. LEXIS 3333, 2010 WL 1957785 (Apr. 19, 2010). Justice Alito recently noted that the Supreme Court has never resolved the circumstances under which an employer/decision-maker may be held liable based on the discriminatory intent of subordinate employees who influence but do not make the ultimate employment decision. Pricci v. DeStefano, 129 S. Ct. 2658, 2688-2689, 174 L.Ed.2d 490 (2009) (Alito concurring)(noting as examples the various approaches of the courts in Coca-Cola Bottling Co. of Los Angeles, 450 F.3d

416, 484-488 (6th. Cir. 2006); Russell v. McKinney Hosp. Venture, 235 F.3d 219, 227 (5th. Cir. 2000); and Poland v. Chertoff, 494 F.3d 1174, 1182 (9th. Cir. 2007)).

10. Wis. Adm. Code, DOC 310.03 (15)("'Reviewing authority' means a person who is authorized to review and decide an inmate complaint.").

11. Dole v. Chandler, 438 F.3d 804, 809, 812 (7th. Cir. 2006)("'Prison officials may not take un-fair advantage of the exhaustion requirement... and a remedy becomes 'unavailable' if prison employees... otherwise use affirmative mis-conduct to prevent a prisoner from exhausting."); Woodford v. Ngo, 548 U.S. 81, 102, 126 S. Ct. 2378 (2006)(recognizing that prison officials might "create procedural requirements for the purp--ose of tripping up all but the most skillful prisoners"); Westefer v. Snyder, 422 F.3d 570, 580 (7th. Cir. 2005)(Remedies not "available" where there was no "clear route" to exhaustion); Cabrera v. Levi, 2008 WL 215770, #6 (D.N.H., Jan. 24, 2008)("Inmates cannot be expected to meet procedural requirements that are un--disclosed."); Hall v. Sheahan, 2001 WL 111019, #2 (N.D. Ill., Feb. 2, 2001 ("A grievance procedure that is not made known to inmates is not an 'available' administrative remedy."); Jackson v. Ivens, 244 Fed. Appx. 508, 513 (3d Cir. 2007)(Unpublished) ("we will not condition exhaustion on unwritten or implied requirements.") citing ▒▒ Spruill v. Gillis, 372 F.3d 218, 234 (3d Cir. 2004). See State ex rel Freeman v. Berge, Complaint, n. 4.

12. See Wis. Stat., § § 973.155 (5).

13. See Wis. Stat., § § 973.19 (1).

14. See Wis. Stat., § § 973.195 (1r)(a)(1), (3), (5).

15. See "DAI" Division of Adult Institutions) #303.00.04 (New Eff. Date: 06/01/15)("Restrictive Status Housing (RSH)▒ (formerly known as Segregation)- A secured housing unit where inmates are separated from the general population and privileges and property are limited").

16. See Wis. Adm. Code, DOC 311.04 (1)("Observation for mental health purposes is an involuntary or voluntary non-punitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or the safety of others...").

17. See Taylor v. Michigan DOC, 69 F.3d 76, 81 (6th. Cir. 1995)("Here, by contrast, Morris is charged with abandoning the specific duties of his position-- reviewing and responding to inmates' complaints... in the face of actual knowledge of a breakdown in the proper workings of the department. [Plaintiff] does not seek to hold ▒ Morris liable for the head nurse's mis-conduct. Rather, Morris personally had a job to do, and he did not do it. His failure to do his job resulted directly in a violation of the plaintiff's ... rights."), quoting Hill v. Marshall, 962 F.2d 1209, 12.15 (6th. Cir. 1992).

(28)

18. The Waupun Correctional Institution has since switched to a Contract/Purchase for selection of WestLaw® legal research materials on computer.

19. Wis. Adm. Code, DOC, 309.155 (1)("POLICY. It is the policy of the department to permit reasonable access to the judicial process and to legal materials, and to afford a reasonable opportunity to prepare legal documents. Such access serves important rehabilitative goals and ensures effective procedures for raising and resolving complaints about institution practices and policies."); 309.155 (2)("ACCESS TO COURTS. Inmates shall have access to courts and administrative agencies. Inmates' decisions to seek judicial or administrative relief shall not adversely affect their program, security classification or assignment to an institution."); 309.155 (5)("ACCESS TO LEGAL MATERIALS. Each institution, except Correctional Centers and the Wisconsin Resource Center, shall maintain a law-library and make legal materials available to inmates at reasonable times and for reasonable periods. Special provisions shall be made to provide access to legal materials for inmates with a special legal need and for inmates with a special legal needs such as illiteracy. The department may employ the use of current technology in providing access to legal materials."); Wis. Adm. Code, Doc 309.20 (a)(6)("The department shall allow an inmate legal materials which are necessary for that inmate's legal actions or the actions of another inmate whom the first inmate is assisting...").

20. Wis. Stat., 809.11(3)(b)(1)(a)(b),(3)(c) (4).

21. DAI policy #309.15.01 (V)(B)(Eff. Date: 9/11/09)("EILLS [(Electronic Institution Law Library Stations)] work stations and other legal resources may be provided in remote location with staff supervision").

22. WCI has RHU Cells that contain outlets which may be used for monitored- RHU cells are available that have cameras installed, as well as rooms for EILLS - typewriter and Microsoft word® employ. See State ex rel. Terril Jr. Traczer, 60 Wis. 2d 490, 496, 502, n. 1, n.1, 211 N.W. 2d 4,7, 10 (Wis. S.Ct. 1973)("There are, however, other fundamental rights, tempered by reasonable regulations, that remain in Wis. One such right of constitutional importance is access to the courts. He must be afforded legal remedies after his conviction to not only challenge the legality of his conviction but also the term of his confinement, parole and probation revocation and some matters of in-prison control.....There's a saying in prison circles that typewriters have replaced the hacksaw as a way to get out of the penitentiary."), citing to Johnson v. Avery, 393 U.S. 483, 486, 89 S. Ct. 747 (1969); Cruz v. Beto, 329 F. Supp 899 (D.C. Wis. 1971) and Charles Larson, A Prisoner Looks at Writ-Writing, 56 Cal. L. Rev. 342, 345 (1968).

23. Bounds v. Smith, 430 U.S. 817, 822 (1977)(Requiring prisoners access to the courts must be adequate, effective, and meaningful.).

24. November 23, 2019; State v. Crane, Appeal No. 19-AF-1668-cr.

25. See Complaint, Footnote 10.

26. See Complaint, Footnote 8.

27. Id.

28. See Complaint, Footnote 6.

29. See Wis. Adm. Code, DOC, 310.12(3)("An inmate may appeal the reviewing authority decision within 14 days after the date of the decision by filing a typed or legibly printed request for review with the CCE on forms supplied for that purpose. The institution shall make these forms accessible to inmates.")(2020).

30. See Lewis V. Casey, 518 U.S. 343, 355, 116 S. Ct. 2174, 2182 (1996) ("The tools [Bounds] requires to be provided are those that the inmate need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.") See also Complaint, PP. 16-18.

31. "Monospaced font' means a font in which each character uses an equal amount of horizontal space." Wis. Stat., §809.01(5d). "If a monospaced font is used: 10 characters per inch, double-spaced, a 1.5 inch margin on the left side and a one-inch margin on all other sides." Wis. Stat., 809.19(8)(b)(3).

32. "Proportional font' means a font in which the horizontal space used by a character varies." Wis. Stat., 809.01(5g). "Serif font' means a font that has short ornaments or bars at the upper and lower ends of the main strokes of the character." Wis. Stat., 809.01(8). "If a proportional font is used: proportional serif font, minimum printing resolution of 200 dots per inch, 13 point body text, 11 point for quotes and footnotes, leading of minimum 2 points, maximum of 60 characters per full line of body text. Italics may not be used for normal body text but may be used for citations, headings, emphasis and foreign words." Wis. Stat., 809.19(8)(b)(2)(C)(2018).

33. "Correctional Complaint Examiner' or 'CCE' means the employee of the department who is designated by the Secretary to process and review complaints appealed to the Secretary." Wis. Adm. Code, DOC, 310.03(4)(2020)

34. "Secretary' means the Secretary of Corrections." Wis. Stat., §301.01. Cf. Wis. Adm. Code, DOC 310.03 (16)("Secretary' means the Secretary of the department or designee.") See also Wis. Stat., §§16.004, 301.03(1), 201.03(2).

35. Wis. Adm. Code, DOC, 310.12(7)("The CCE shall have full access to the institution, inmates, employees, and department records to investigate the appeal.").

36. Wis. Adm. Code, DOC, 310.12(9)("For all accepted appeals, the CCE shall recommend that the reviewing authority decision be affirmed or dismissed in whole or in part, and send its recommendation to the Secretary...").

37. Wis. Adm. Code, DOC, 310.13(2)("The Secretary shall affirm or dismiss the CCE's recommendation, in whole, or in part, or return the appeal to the CCE for further investigation.").

38. See Complaint, p.3, footnote 34; See also Wis. Adm. Code, DOC 310.01(1)("The purpose of this chapter is to afford inmates in institutions a process by which grievances may be expe-diteously [raised] investigated, and decided.")

39. See Cole v. Johnson, 861 F.2d 943, 954, n.2 (6th. Cir. 1988) (Murray's Lessee v. Hoboken Land and Improvement Co., 59 U.S. 272, 18 How. Pc. 272, 276; 15 L. Ed 372 (1856), a decision cited with approval in Daniels v. Williams, 474 U.S. 327, 332-333, 88 L.1.2d 662, 106 S. Ct. 662 (1986), tells us what was originally meant by 'due process of law' as used in the Fifth Amendment,' and what Lord Coke, in his famous Commentary on Magna Charta, said was conveyed in the latter document by the phrase 'by the law of the land.' That phrase appears in a chapter (Chapter 29) of Magna Charta that may be trans-lated as follows:

> No free man shall be taken, or imprisoned, or disseised of his free tenements, or liberties, or his free customs, nor shall he be outlawed, or exiled, or in any way destroyed, nor will we go upon him, nor will we send upon him, but by the lawful judgment of his peers, or by the law of the land. To none will we sell, to none will we deny, or delay justice, or right.

(Emphasis supplied) As quoted (in Latin) at Coke, 2d Inst., 45.") (David A. Nelson, Circuit Judge, concurring).

40. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 47 U.S.C. §12132 (coded). Crawford v. Indiana DOC, 115 F.3d 481, 486 (7th Cir. 1997)("Rights against discrimination are among the few rights prisoners do not park at prison gates." Prisoners "have the same interest in access to the programs, services, and activities available to other inmates of their prison as disabled people on the outside have to the counterpart programs, services and activities of free people."). Educational programs and use of "library" and "dining hall" are programs of a public entity. See Crawford, id., at 483-84. Cf. Radaszewski v. Buckel, Dangld Dept. of Corrections and Rehabilitation, 570 F.3d 946, 947-977 (8th. Cir. 2001) ("A state's prison system as a whole qualifies as a program or activity within the meaning of 'Title IX.'); Bragdon v. Abbott, __U.S.__, __, 118 S. Ct. 2196, 2205 (1998)(Holding that "A person will also be considered disabled, for purposes of this [law] if there is a record of such impairment" and that the ADA protections extend to include "functions such as caring for ones self, perform-ing manual tasks, seeing, hearing, speaking, breathing, learning and working.").

# G. CONCLUSION

WHEREFORE, based on the statement of claims, authorities-in-support and footnotes, plaintiff requests to proceed with claims against against the defendants named herein as follows: The Wisconsin Departments

of Corrections, and Brian Foster for violating plaintiff's rights, as provided by the Americans with Disabilities Act; As well as the Secretary Kevin A. Carr; Plaintiff also requests to proceed with claim against, Kevin A Carr, Cindy O'Donnell, Brad Hompe, Brian Foster, Capt. Tritt, Ms. Trolla T. Moon, Brett Helmer, Nium Vichitvongsa, Catherine Broadbent, Mary Salmon for violating Plaintiff's rights, as provided by the WI. Constitution, Article I, §§ 1 (Equal Protection and Consent clause) and Art. thereof clause), Art. I, § 4 (Right to Petition the Government or any department thereof clause), Art. I, § 9 (Remedy for Wrongs ("Due process clauses") and by the U.S. Constitution, Amendment I "I" (Right to Petition the Government clause) Amendment V (Due Process Clause), Amendment 14 (Due Process and Equal Protection ("class-of-one")) Clauses. See AZ (U.S.C. § 12131 (1)(A) (Providing that under the ADA, the term "public entity" means any State or local government); Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304 (1989)(Allowing official capacity claims against individual defendants to the extent they are proxies for the State); Omasabian v. Wells, 335 F.3d 668, 672-673 (7th Cir. 2003)(Holding only injunctive relief available against official sued in official capacity); Walker v. Snyder, 213 F.3d 344, 347 (7th Cir. 2000)(There is no personal liability for individual defendants under the ADA); See also Christopher v. Harbury, 536 U.S. 403, 415, n.12 (Citing cases that trace the constitutional source of the right to the Privileges and immunities clause of Article IV, the First Amendment petition clause, the Fifth Amendment due process clause and the due process and equal protection clauses of the fourteenth Amendment); Van Horne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 309, 28 F. Cas. 1012 (C.C.D. Pa. 1795)("It is an important principle, which... ought never be lost sight of, that the judiciary in this country is not a subordinate, but Co-ordinate, branch of Government."); Lousaine v. Coughlin, 862 F. Supp. 1016, 1121 (S.D.N.Y. 1994)(Stating prison officials have discretionary authority, but federal courts must be especially vigilant to ensure that all citizens—even the most unpopular—are guaranteed the protections secured by the Constitution."), quoting Santiago v. Miles, 774 F. Supp. 775, 776 (W.D.N.Y. 1991).

Signed and dated on this 1st day of February, 2020.

_[signature]_